[Civ. No. 24111.   Second Dist., Div. Three.   July 7, 1960.]

LESLIE GARDNER, Appellant, v. VIC TANNY COMPTON, INC. (a Corporation), Respondent.

Butler & Hegner and James G. Butler for Appellant.

Spiegel, Lincoff & Wolfson and Gerald G. Wolfson for Respondent.

VALLÉE, J.—Appeal by plaintiff from an adverse judgment in an action to recover damages for alleged violation of Civil Code, sections 51 and 52.[1]

---

[1]At the time in question (1956) section 51 read: "All citizens within the jurisdiction of this state are entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating-houses, places where ice cream or soft drinks of any kind are sold for consumption on the premises, barber shops, bath houses, theaters, skating rinks, public conveyances and all other places of public accommodation or amusement, subject only to the conditions and limitations established by law, and applicable alike to all citizens."

At the time in question (1956) section 52 read: "Whoever denies to any citizen, except for reasons applicable alike to every race or color, the full accommodations, advantages, facilities, and privileges enumerated in section fifty-one of this code, or who aids, or incites, such denial, or whoever makes any discrimination, distinction or restriction on account of color or race, or except for good cause, applicable alike to citizens of every color or race whatsoever, in respect to the admission of any citizen to, or his treatment in, any inn, hotel, restaurant, eating house, place where ice cream or soft drinks are sold for consumption on the premises, barber shop, bath house, theater, skating rink, public conveyance, or other public place of amusement or accommodation, whether such place is licensed or not, or whoever aids or incites such discrimina-

Defendant Vic Tanny Compton, Inc., is a California corporation. On November 3, 1956, plaintiff applied to defendant in writing to take a course in physical training at defendant's gymnasium in Compton and offered to pay the amount requested for a "course of physical education." Defendant declined to furnish the course to plaintiff. The sole reason defendant refused was on account of plaintiff's race and color, and not for reasons applicable "to all citizens alike of every race, creed or color."

The court found: the premises of defendant "were open to engagement by some but not all members of the general public"; defendant "furnished courses of education to others of the general public but not to all members thereof"; "the facts of the case do not bring it within" Civil Code, section 51 or 52; the premises operated by defendant "did not constitute a place of public amusement or public accommodation at the time or times plaintiff was denied admission."

The sole question is whether the finding that defendant's gymnasium was not a place of public accommodation or public amusement is sustained by the evidence. The only evidence introduced at the trial was as follows: The vice-president of defendant's advertising agent in October, 1956, testified to a list of television stations over which defendant advertised between June 7, 1956, and December 1, 1956. Examples of the advertisements were introduced in evidence. A specimen of the script used is set out in the footnote.[2]

---

tion, distinction or restriction, for each and every such offense is liable in damages in an amount not less than one hundred dollars, which may be recovered in an action at law brought for that purpose."

[2]"Pick up your telephone and call your nearest Vic Tanny Gym . . . Find out about the great offer that Vic Tanny's making now . . . This is———————inviting you inside a Vic Tanny Gym for Women . . .

"Vic Tanny has the largest and finest chain of gyms in America . . . There's specialized equipment for reducing or weight gaining, or bust development . . . Results are guaranteed . . . Now here's Vic Tanny . . . OVERWEIGHT OR UNDERWEIGHT, . . . THE RESULTS WE GIVE YOU ARE GUARANTEED AND PERMANENT . . . STOP IN AT OUR GYMS ANYTIME.

"You business men who are fighting the battle of the bulge . . .Start now at Vic Tanny's . . . Now, if you happen to be thin, like this fellow, soon you'll have a perfect physique, like this . . . At Vic Tanny's Beginner's Courses start every day . . . You'll enjoy every moment . . . You'll have a lot of fun . . .

"Remember, if you would like a guest card for a complete FREE TRIAL . . . Just pick up your telephone and call your nearest Vic Tanny Gym and they'll give you one of these guest cards . . . Also, tell them your present weight . . . Ask how long it will take to have the results you want . . .

"Remember, if you join now and go for example, 3 times a week, it averages only 55c a visit on a regular course basis. Vic Tanny Gyms are everywhere. . . .

"Gyms in Van Nuys, Long Beach, Westwood…they're everywhere.…"

A director of defendant testified: he had been connected with "Vic Tanny Compton Gym" for several years and in November, 1956. In November, 1956, the facilities at "Compton Gym" were various types of equipment designed and utilized for corrective exercise, specifically "gym" equipment, showers, and dressing facilities. There was no swimming pool or steam room. At that time people were allowed to come in on a membership basis; they were enrolled for six months or a year. A person applying for membership had "to make out an application" in writing. The procedure when a person came into the "gym" was as follows: "[T]he first thing the management must do is to find out whether the person is sincere in their desire to improve their physical appearance, physical condition and improve their health." "Q. Was that the only measure which you used to allow or disallow people from membership? A. Definitely not. Q. What other policy did you follow at that place at that time? A. Well, a person must be—let me see, how would I put that correctly?—the manager is instructed to use his own discretion as far as screening people; not to accept anyone who would be detrimental to the business welfare at that specific location. Q. Did that include also an instruction to them that Negroes were detrimental to the welfare of that particular establishment? A. It was put on the basis where the manager, of course, was in charge of the gym and did the screening himself to use his own judgment on the merits of the individual and not to any single specific group or to Negroes as a block. . . . A person who had any physical history of any medical difficulty whatsoever or psychological emotional problems, it is obvious we would never enroll. Q. How would you determine it? Is that on the application at the time? A. No, it is done in the process of the manager interviewing the individual. . . . Q. . . . You stated that the policy was of turning down people who wouldn't further the business; is that correct? A. I said that we would not accept anyone whom they might judge as being detrimental to the business. Q. Well, didn't that include a general policy of turning down all Negroes? A. I wouldn't say that. . . . Q. . . . The general public may apply for admission; is that correct? A. I would say so. Q. Your invitation advertising was given to everyone; is that correct? A. 'Eight to eighty' is the way we stated it. Q. Was a year the lowest period of time which you would allow anybody to enroll for? A. The only exception would be guests of existing members who were training at some gym out of town and were visiting

for a short period of time. . . . Q. . . . Did you in November of 1956 have a general policy at the Compton Gym to refuse admission to Negroes? A. No." Defendant also issued guest passes. "Q. That is all you had to do, is just call up and say, 'Mr. Smith, I would like a guest card. I would like to come over and work out,' and you would let them work out? A. Well, we would set up an appointment for them when and where we could have the extra help there and take them through the guest trial to see whether they would be adaptable to the program."

The civil rights statutes are concerned with the protection of equal rights with respect to facilities and services offered to the public by private persons. (10 Stanford L. Rev. 253, 255.) "The intent of section 51 is to give all persons full and equal accommodations and privileges in places of public accommodation and amusement, 'subject only to the conditions and limitations established by law, and applicable alike to all citizens.' " (*McClain* v. *City of South Pasadena,* 155 Cal.App.2d 423, 432 [318 P.2d 199].)

The scope of the statutes is limited to places of *public* accommodation and amusement. The courts have construed section 51 as applicable to public saloons and bars (*Evans* v. *Fong Poy,* 42 Cal.App.2d 320 [108 P.2d 942]); a theater (*Jones* v. *Kehrlein,* 49 Cal.App.646 [194 P. 55]; *Prowd* v. *Gore,* 57 Cal.App. 458 [207 P. 490]); a soda fountain where food is served (*Hutson* v. *Owl Drug Co.,* 79 Cal.App. 390 [249 P. 524]); a municipal bathhouse and swimming pool open to the public (*Stone* v. *Board of Directors of Pasadena,* 47 Cal.App.2d 749 [118 P.2d 866]); a race track (*Pacific Turf Club* v. *Cohn,* 104 Cal.App.2d 371 [231 P.2d 527]; *Suttles* v. *Hollywood Turf Club,* 45 Cal.App.2d 283 [114 P.2d 27]); a hotel (*Piluso* v. *Spencer,* 36 Cal.App. 416 [172 P. 412]); a shoe store (*Lambert* v. *Mandel's of California,* 156 Cal.App.2d Supp. 855 [319 P.2d 469]). On the other hand, it has been held that section 51 is not applicable to a cemetery (*Long* v. *Mountain View Cemetery Assn.,* 130 Cal.App.2d 328 [278 P.2d 945]) or to a dentist's office (*Coleman* v. *Middlestaff,* 147 Cal.App.2d Supp. 833 [305 P.2d 1020]).

"Public" is sometimes defined as "Common to all or many; general; open to common use." (Black's Law Dict., 3d ed., 1460.) One definition of "public" given by Webster is "Open to common, or general use, participation, enjoyment, etc.; as, a *public* place, tax, or meeting. Specif.: *a* Open to the free and unrestricted use of the public; as, a *public* park or

road. *b* Open to the enjoyment of the public under the rights and liabilities belonging to an action, occupation, use, or the like, called *public* (sense 1); serving the public under some degree of civic or state control; as, a *public* house; *public* conveyances or utilities.'' It has been held that a public beach is one open to the common use of the public. (*Brower* v. *Wakeman*, 88 Conn. 8 [89 A. 913, 914].) And referring to a public lavatory, ''one that is open to all who may choose to use it.'' (*Irvine* v. *Commonwealth*, 124 Va. 817 [97 S.E. 769].)

*Fowler* v. *Benner*, 13 Ohio N.P.N.S. 313, says (p. 316): ''It may not be unprofitable at this time to inquire what is meant by 'a place of public accommodation.' Anderson's law dictionary defines the word public, when used as an adjective, as in the phrase 'public accommodation,' to mean, concerning or affecting the people or community at large; or, a place for the accommodation of all persons. A public place may be defined, generally, to be a place to which any one may have access without trespassing (see Century Dictionary).''

*Reed* v. *Hollywood Professional School*, 169 Cal.App.2d Supp. 887 [338 P.2d 633], was an action for damages arising from refusal of a private school to enroll a Negro. The opinion states (p. 888):

''Plaintiff, a 5-year-old Negro girl, by her guardian *ad litem*, appeals from the order and judgment of nonsuit; she claimed damages for violation of her civil rights under the provisions of Civil Code, sections 51, 52, 53 and 54, because of defendant's refusal to enroll her in defendant's school by reason of the fact that she was a Negro, and that she was discriminated against solely because she was a member of that race. At the trial it was stipulated that defendant is and always has been a private school.

''Plaintiff contends that a private school is within the meaning of the words 'all other places of public accommodation or amusement' in Civil Code, section 51, and that such denial creates a liability under the provisions of Civil Code, sections 51, 52, 53 and 54. Since sections 53 and 54 by their terms apply only to a person over the age of 21 years, they have no application here.

''The evidence clearly shows that the owner of the defendant school told the guardian *ad litem* of the minor plaintiff that he could not admit Negroes, although a brochure from the school had been received by the guardian's wife, upon which she phoned the school for information.

''Appellant contends further that the school is public in

the sense that the state may regulate certain phases of it under the police power, involving a violation of civil rights because of race, further that the defendant school invites members of the public to attend and solely for financial support of the school. In view of the stipulation, these contentions are specious. . . .

"[P. 889.] Therefore, the question is whether a private school is one of the 'other places of public accommodation or amusement' within the meaning of Civil Code, sections 51 or 52.

"The California cases cited by appellant were under our civil rights statutes, and those of other jurisdictions under similar statutes. The businesses referred to therein obviously were places of public accommodation or amusement similar to the expressly named places and of a similar kind of public accommodation or amusement. .

■ "The settled rule of law is that the expression 'all other places' means all other places of a like nature to those enumerated. [Citation.] ■ While we have said that Civil Code, section 51, 'is to be given a liberal, not a strict, construction . . . this sweeping language [of the statute] does not cover "all places," however.' [Citations.] ■ 'The general intent and significance of the foregoing provisions are clear enough. The purpose, of course, is to compel a recognition of the equality of citizens in the right to the peculiar service afforded by these agencies for the accommodation and entertainment of the public.' [Citation.]

"In the court's opinion a private school is not a place of public accommodation or amusement, nor is it a public place of amusement or accommodation, within the meaning of Civil Code, sections 51 or 52. It is true that racial discrimination in public education is unconstitutional. [Citations.] Rights of racial minorities have gradually been extended. [Citation] (discrimination by labor unions against Negroes); [citation] (labor union); [citation] (same); [citation] (miscegenation); [citation]. In general the extension of such rights has been based upon the discrimination exercised in businesses such as public service corporations or serving a general public purpose or where the public accommodation or amusement was public property or was being used in the exercise of a public function. The civil rights statutes have not been applied in the case of private or semiprivate uses. . . .

"[P. 891.] Appellant claims that the problem here is not one of distinction between public and private schools but

whether a Negro applicant to a private school may be denied admission because of race. Of course the latter is the ultimate question, but it must be decided in part on the distinction between a public and private school in view of appellant's contention that discrimination of any kind is repugnant to the public policy of the State of California.

"To appellant's contention that any distinction or discrimination based upon race is repugnant and void under the Constitution of the United States or of this state, this court cannot agree. While it is true that in *James* v. *Marinship Corp., supra,* 25 Cal.2d 721, 740 [155 P.2d 329, 160 A.L.R. 900], the court referred to Civil Code, sections 51 and 52, as being merely declaratory of common law, and stated: 'The analogy of the public service cases not only demonstrates a public policy against racial discrimination but also refutes defendants' contention that a statute is necessary to enforce such a policy where private rather than public action is involved,' the only question decided by the court in the case was that when a labor union which has attained a monopoly of the labor supply through closed shop agreements, such a union, like a public service business, may not unreasonably discriminate against Negro workers for the sole reason that they are colored persons.

"We do not believe that the doctrine of public policy established by *James* v. *Marinship Corp., supra,* or *Thompson* v. *Moore Drydock Co., supra,* 27 Cal.2d 595 [165 P.2d 901], *Williams* v. *International Brotherhood of Boilermakers, supra,* 27 Cal.2d 586 [165 P.2d 903], applies to a matter of private relationship such as that here before us, since the defendant school has no monopoly and since the Legislature has specifically declared the public policy of the state in regard to discrimination in particular locations and it is the office of the Legislature and not of this court to make any additional enumerations which may be desirable. [Citation.]

"In our opinion private schools should be entitled to contract or refuse to contract with students of their choice for whatever reason if such contract or refusal does not fall within the constitutional or statutory proscription against discrimination on the basis of race or color. We do not find any authority that such refusal does so."

We are in accord with the views thus expressed. On the evidence the court could and did find that defendant's facility was not within the operation of the statutes; that it

was not a place of public accommodation or amusement. Membership in defendant's facility was not open to the public in general. It was limited to those granted membership after an application, an interview, and satisfaction of the manager. There is nothing in the statutes which has the effect of preventing defendant from maintaining a gymnasium for such persons as it saw proper to accommodate, and from excluding such persons as it saw proper to exclude. The record discloses substantial evidence to sustain the findings of the court. Such being the case, the action of the trial court may not be disturbed on review. (*Gilmore* v. *Paris Inn,* 10 Cal.App.2d 353 [51 P.2d 1103].)

Affirmed.

Shinn, P. J., and Ford, J., concurred.