**Linda ROUSSEVE, on behalf of herself, et al., etc., Plaintiffs-Appellants,**

v.

**SHAPE SPA FOR HEALTH AND BEAUTY, INC., et al., Defendants-Appellees.**

No. 74–1945.

United States Court of Appeals, Fifth Circuit.

July 16, 1975.

Rehearing and Rehearing En Banc Denied Sept. 25, 1975.

Robert Glass, New Orleans, La., for plaintiffs-appellants.

Edward J. Gay, III, Rutledge C. Clement, Jr., New Orleans, La., for defendants-appellees.

Before GEWIN, AINSWORTH and MORGAN, Circuit Judges.

GEWIN, Circuit Judge:

On this appeal, the issue is whether a women's health and exercise club or studio is within the coverage of the public accommodations provisions of the Civil Rights Act of 1964. Specifically, we must determine whether such an establishment is a "place of entertainment" within the meaning of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(b)(3), and therefore subject to its provisions. It is our conclusion that the health and exercise studios here involved are "place[s] of entertainment" within the intended coverage of the Act's public accommodations provisions.

Appellants brought a class action under the Civil Rights Act against four New Orleans area Shape Spa health clubs or studios alleging racial discrimination in the membership policies of the studios.[1] The parties filed cross motions

1. The appellees who operate the health studios involved are four separate Louisiana corporations located in or near New Orleans. Appellant Rousseve alleges that she is a black female citizen who has applied for and been refused services by the appellees because of her race. Appellant Robbins alleges that she is a white female citizen who has applied for

for partial summary judgment on the issue of whether the studios were "place[s] of entertainment" within the meaning of the Act and submitted a joint stipulation of fact in connection with the motions. The district court found that the prime purpose of the health studios was "the very serious one of improving physical well-being and any resultant entertainment flowing from use of the clubs' facilities and execution of their program would be nominal and on an individual, and not public, basis." Concluding that the generally accepted meaning of the phrase, "place of entertainment", did not encompass the defendant health studios, the district court granted appellees' motion for summary judgment and dismissed the action.[2] We do not agree with the conclusion of the district court and therefore we reverse its order granting appellees' motion for partial summary judgment.

Title II of the Civil Rights Act of 1964 prohibits discrimination or segregation on the basis of race, color, religion, or national origin in places of public accommodations whose operations affect commerce. Sections 2000a(a), (b)(3), and (c)(3) of 42 U.S.C. provide:

(a) All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of· public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion or national origin.

(b) Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce . . . .

\* \* \* \* \* \*

(3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment . . . .

(c) The operations of an establishment affect commerce within the meaning of this title if . . . (3) in the case of an establishment described in paragraph (3) of subsection (b) of this section, it customarily presents films, performances, athletic teams, exhibitions or other sources of entertainment which move in commerce . . . .

The facilities operated by the appellees are used by approximately 9,000 to 12,000 members per year, some of whom are members of similar health clubs in other states to whom the appellees make available their facilities on a reciprocal basis. The appellees regularly advertise for members on television and in large daily newspapers, solicit memberships by telephone, and generally use media which cross state lines. At least 90% of the equipment used in the health clubs of the appellees was manufactured outside of the state of Louisiana and "moved" in commerce. In our opinion the record clearly supports the conclusion that the operations of the appellees affect commerce within the meaning of the above quoted statute.[3]

and been refused services by the appellees because of her association with and concern for black women.

2. The district court did make the following finding:

We recognize that there are some elements of *fun, relaxation* and *entertainment* derived from many phases of man's daily activities and could well be experienced by some individuals in some of the exercise regimen and programs offered by the defendant clubs. On the other hand, we doubt that the rigors of the exercise and other activities in which overweight and unshapely female patrons of the clubs must participate to achieve their desired goals and the ultimate benefits offered by the clubs' programs can be regarded as *entertainment of a nature* which would cause the clubs to be brought within the Act's coverage. Surely, one who executes the exercises and performs the activities required by the program and upon completion of the course has achieved the maximum benefits possible for that individual may derive great personal satisfaction and joy, and, looking back, describe the experience as *fun*. But those who do not accomplish as much likely would experience disappointment and frustration and condemn the whole affair as an ordeal. (Emphasis added).

3. Although the district court found that the activities of the appellees did not come within the terms of Title II of the Civil Rights Act of

■ . One of the purposes of the public accommodations provisions of the Civil Rights Act of 1964 was to eliminate the unfairness, humiliation, and insult of racial discrimination in facilities which purport to serve the general public. H.R. Rep. No. 914, 88th Cong., 1st Sess., 18 U.S.Code Cong. & Admin.News 1964, p. 2355. This circuit, *en banc*, while acknowledging that the Act was not intended to cover all establishments, has committed itself to the view that § 2000a(b)(3) must be read "with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities described in the Act which are open to the general public." Miller v. Amusement Enterprises, Inc., 394 F.2d 342, 349 (5th Cir. 1968). In *Miller* this court concluded that an amusement park was a "place of entertainment," reasoning that the phrase included "both establishments which present shows, performances and exhibitions to a passive audience and those establishments which provide recreational or other activities for the amusement or enjoyment of its patrons." 394 F.2d at 350. The Supreme Court, in Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), endorsed the view of this circuit that the statutory language "place of entertainment" should be read to include recreational areas as well as places of spectator entertainment.[4]

■ In Daniel v. Paul, the Supreme Court noted that "entertainment" is defined as "the act of diverting, amusing, or causing someone's time to pass agreeably: [synonymous with] amusement." 395 U.S. at 306 n.7, 89 S.Ct. at 1701, 23 L.Ed.2d at 318 n.7. It is clear to us that the activities available at the health studios fall within this definition

of "entertainment." In view of the nature of the program offered by the health studios of appellees and considering the image that the studios have chosen to project through their advertisements, we feel that it is neither straining language nor expanding the definition of the word "entertainment" to hold that the health and exercise studios are covered by the phrase "place of entertainment" as it is used in § 2000a(b)(3).

We recognize that the health and exercise studios differ from the amusement park in *Miller* and the lake retreat in *Daniel* but, nevertheless, we feel that the term "place of entertainment" includes the health and exercise studios operated by appellees. It is stipulated that the health spas offer "general programs of curative or rehabilitative treatment, including diets, physical exercises, baths and sauna treatments." Studio facilities consist of various gymnasia equipment, thermal and whirlpool baths, inhalation rooms, solaria, and swimming pools; body massages and facial treatments are available.

As previously noted, new members are solicited through television and newspaper advertisements, through random telephone solicitations, and through offers of "complimentary visits" and "special introductory programs." In a newspaper advertisement which shows women relaxing in lounge chairs, the studios invite participation in their weight reduction program: "The most unusual part of the process is how little effort it takes to reduce. Snooze, read, play cards, or just relax while those unwanted inches melt away." Pleasure and relaxation are stressed as perquisites of membership in the studio programs: " . . . Have fun with our fabulous personalized exercise program. Swim and Luxuriate in

---

1964, it did conclude that the facts disclosed by the record would support a finding that the activities of the appellees in the operation of the health clubs or studios in question did affect commerce. It felt such a finding was unnecessary in view of its conclusion that the appellees' establishments were not "place[s] of entertainment" under the Civil Rights Act of 1964. Appendix p. 53.

**4.** In Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), the establishment in question was the Lake Nixon Club near Little Rock, Arkansas. The club was a 232-acre amusement area with swimming, boating, sun bathing, picnicking, miniature golf, dancing facilities, and a snack bar.

the Whirlpool Baths. Invigorate. Ah! Luxury! . . ." One advertisement urges: "Have fun with our introductory offer. . . ." Another offers "the poolside lounge area for carefree lazing . . . ." A third advertisement entices: "Enter a Shape Spa, and you know immediately you're in a ·woman's world. Here there's no strenuous exercise, only relaxing slimnastics— . . . everything to make your visits to Shape Spa enjoyable. Everywhere there is the air of luxury and elegance so appealing to a woman. . . . [Y]ou can use all the facilities of this complete beauty resort as frequently as you like."

Included in the stipulated exhibits is the training manual for Shape Spa employees. It contains this introductory statement: "We sell Health, Beauty, Youth, Physical Ability, Social Recognition. Those are the things our customers want. We supply these by giving our customers a mixture of attractive club facilities, concrete programs of exercise, *recreation,* and diet, in which we instruct, supervise, and counsel them." (Emphasis added.) We regard this as a further indication that appellees' studios themselves consider their program to be of a recreational nature. However, by no means do we intend to suggest that our decision is based solely on the presence of the word recreation in the employee's training manual.

The facilities and services provided by the health studios are similar in many respects to the health and exercise activities available at a YMCA. In Smith v. Young Men's Christian Ass'n of Montgomery, 462 F.2d 634 (5th Cir. 1972), this court affirmed a district court finding that the recreational activities of the Montgomery, Alabama YMCA "come under the broad definition of entertainment expounded in *Miller* and espoused in *Daniel."* 462 F.2d at 648. We can see nothing in the operation of the appellee health spas which would lead to a contrary result in this case.

Appellees argue that their purpose is to correct physical deficiencies and promote the physical well-being of their patrons; they maintain that they are not "places of entertainment." While we do not doubt that appellees have properly characterized one of the purposes of their health and exercise program, we are convinced that there are sufficient entertainment and recreational aspects of the programs offered to permit the studios to be termed "place[s] of entertainment." We concluded in United States v. DeRosier, 473 F.2d 749 (5th Cir. 1973), that § 2000a(b)(3) does not require that the "entertainment be of a certain variety or that a certain quantum of the establishment's business be derived from the entertainment of its customers." 473 F.2d at 752. Our determination that the health studios are "place[s] of entertainment" is not disturbed by the fact that they also have the serious purpose of weight reduction and figure control. Such a dual purpose will not operate to remove them from the coverage of the Civil Rights Act.

For the foregoing reasons, we hold the studios to be "place[s] of entertainment" covered by § 2000a(b)(3) of the Civil Rights Act of 1964. The judgment of the district court is reversed and the case is remanded for the entry of an appropriate judgment consistent with this opinion.

Reversed and remanded.

AINSWORTH, Circuit Judge (dissenting):

Though firmly in agreement that 42 U.S.C. § 2000a(b)(3) must be liberally construed to accomplish the purposes of the Act, I nevertheless disagree with the extreme interpretation by the majority that the term "place of entertainment" includes the Shape Spa health studios. The majority has simply failed to accord the term "place of entertainment" its generally accepted meaning as employed in common parlance. Thus the congressional purpose is frustrated for the public accommodations provisions of the Act were not designed to include all establishments. I agree with District Judge Boyle that a Shape Spa health studio is not a "place of entertainment" and at-

tach his well-reasoned opinion (Appendix), which I would affirm, as reflecting my views on the subject.

## APPENDIX

BOYLE, District Judge:

Plaintiffs sue Shape Spa asserting violation of and jurisdiction under the Civil Rights Act of 1964.

Cross motions for summary judgment involving the issue of jurisdiction have been filed with a stipulation of facts. Both motions raise the question of whether or not the defendant health studios are "Public Accommodations" within the meaning of Title II of the Civil Rights Act of 1964. 42 U.S.C. § 2000a et seq. which provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

It is evident from the language of the statute that Title II does not prohibit discrimination in all places, or even in all places of "Public Accommodation." Title II prohibits discrimination *only* in any place of public accommodation *as defined in this section.* (Emphasis ours). 42 U.S.C. § 2000a. The congressional intention to limit the scope of the application of Title II is clear from the definitive nature of 42 U.S.C. § 2000a(b):

> (b) Place of public accommodation. Each of the following establishments which serves the public is a place of public accommodation within the meaning of this title [42 USCS §§ 2000a–2000a–6] if its operations af-

fect commerce, or if discrimination or segregation by it is supported by State action:

> (1) any inn, hotel, motel, or other establishment which provides lodging to transient guests, other than an establishment located within a building which contains not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence;

> (2) any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility principally engaged in selling food for consumption on the premises, including, but not limited to, any such facility located on the premises of any retail establishment; or any gasoline station;

> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; and

> (4) any establishment (A)(i) which is physically located within the premises of any establishment otherwise covered by this subsection, or (ii) within the premises of which is physically located any such covered establishment, and (b) which holds itself out as serving patrons of such covered establishment.

The record supports the finding that the defendant health clubs do not fall within any of the classifications found in 42 U.S.C. § 2000a(b)(1), (2) and (4).[1] Nor are they motion picture houses, theaters, concert halls, sports arenas or stadia enumerated in 42 U.S.C. § 2000a(b)(3). The only classification into which plaintiffs contend the defendants clubs fall is that of "other place of exhibition or entertainment." 42 U.S.C. § 2000a(b)(3).[2]

---

**1.** There is no contention by the plaintiffs that the defendant health clubs come under Subsections (1, 2) or (4) of Section 2000a(b). As the defendants point out in memorandum, subsection (1) is obviously inapplicable as no lodging accommodations are provided to transient guests or anyone (paragraph 8 of the stipulation); subsection (2) is not applicable as there are no restaurants, coffee shops, or

snack facilities whatsoever (see § 8 of stipulation) and subsection (4) is not applicable because there are no covered premises located within the defendant Shape Spa studios and defendant Shape Spa studios are not located within any covered establishment.

**2.** See the last sentence of Paragraph II of the complaint.

Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq., is carefully limited to enterprises having a direct and substantial relationship to the interstate flow of goods and people.[3] The Fifth Circuit has recognized that the Act was not designed to cover all establishments. Miller v. Amusement Enterprises, 394 F.2d 342 (5 Cir. 1968); United States v. DeRosier, 473 F.2d 749 (5 Cir. 1973). In *DeRosier*, the court went on to say:

> . . . this Court en banc concluded that Sections 2000a(b)(3) and (c)(3) must be read "with open minds attuned to the clear and strong purpose of the Act, namely, to secure for all citizens the full enjoyment of facilities *described in the Act* which are open to the general public. That Title II of the Civil Rights Act is to be liberally construed and broadly read we find to be well established." Miller v. Amusement Enterprises, Inc., 5 Cir. 1968, 394 F.2d 342, 349. Thus we read the statute, particularly the term "place of entertainment", as did the Supreme Court in Daniel v. Paul, 1969, 395 U.S. 298, 307–308, 89 S.Ct. 1697, 1702, 23 L.Ed.2d 318, 326, *according to its generally accepted meaning* so as to give full effect to Congress' overriding purpose of eliminating the affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public. (Emphasis ours).

The generally accepted meaning of the Act's language—"place of exhibition or entertainment"—does not encompass the defendant clubs.

In enacting the public accommodations section of the 1964 Act, Congress did not intend to regulate all establishments that it had the power to regulate. Broad coverage of retail establishments was originally contemplated, H.R. 7152, but that coverage was deleted when the House Judiciary Committee reported the bill. H.R. No. 914 on H.R. 7152, 88th Congress, 1st Session, Part I at 2–3. Congress intended to limit coverage to "those business establishments which on the basis of current experience have proven to be the most important sources of discrimination and, therefore, the focal point of most discriminations." House Judiciary Committee Hearings on H.R. 7152, Part IV at 2555–56 (statement of Attorney General Kennedy).

The concept of generally accepted meaning should not be employed to override what has been judicially established as the intent of Congress, by expanding the scope of a congressionally-limited meaning. Immediately following the language in *Miller* regarding interpretation of Title II of the 1964 Civil Rights Act, the following language appears:

> Though we give to the Act a liberal interpretation, we are aware that the Act was not designed to cover all establishments. "Congress * * * exclude[d] some establishments from the Act either for reasons of policy or because it believed its powers to regulate and protect interstate commerce did not extend so far." Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 273, 85 S.Ct. 348, 366, 13 L.Ed.2d 258, 277 (1964).

The stipulation of the parties establishes that there are no amusement or entertainment facilities such as juke boxes or record players (see § 8); and no restaurant or "snack" facilities, shows, performances, or athletic competitions. An insight into the actual operation, object and purpose of defendant health clubs may be gleaned from the training program of Shape Spa's employees. We quote from the Shape Spa Training Program:[4]

> We sell Health, Beauty, Youth, Physical Ability, Social Recognition. Those are the things our customers want. We supply these by giving our customers a mixture of attractive club facili-

---

3. Except where state action is involved. See § 2000a(c) and Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241 at 250, 85 S.Ct. 348, 13 L.Ed.2d 258.

4. Exhibit "A", pages 6 and 7.

ties, *concrete programs of exercise, recreation, and diet,* in which we instruct, supervise, and counsel them.

B.  What Does A Technician Do?

C.  Service to Members

1.  After a member has printed her name on the sign in sheet, stored her belongings and reported to the gymnasia area, she is to be conducted through her program.

2.  Pull members chart, change programs where needed—for the benefit of the member (increase or even decrease if necessary).

3.  Be sure program is marked with the correct repetitions for the day. Date the program each day member attends club.

4.  Carry member's chart with you so you know exactly what she is doing.

5.  Stress to the member the importance of following the program as outlined.

6.  Be interested in the member and use her *name* frequently.

7.  *Encourage correct exercise form.*

8.  Encourage *dieting* and following *their diet program.*

9.  *Weigh member each week on same day* and *hopefully* at the same time.  Award success sticker for *weekly weight loss goal* if it is achieved.

10.  Be sure to call attention to their *improvements.*

11.  Avoid negative comments to the member.

12.  After member has completed program in gymnasia area—instruct member to change clothing (in dressing booths) and continue instruction in wet area phase of program.

13.  After completion of member's entire program, refile program and encourage member to return for next *treatment.*

14.  Be professional.  (Emphasis ours).

The use and purpose of the gymnasium is evidenced by the following statement in the defendants' training manual:

The gymnasia area with exercise equipment and electrical equipment is designed to help the members of our club *lose weight, gain weight, or reproportion body dimensions as well as to provide general conditioning for the body.*  Each exercise offers a particular benefit to the member.  (Emphasis ours).

Studio equipment such as:

*Item*

1.  Hips Away
2.  Bicycle
3.  Waist Cincher Unit
a.  Rack
b.  Bent Leg Board
c.  Straight Leg Board
4.  Beauty Bell Unit, consisting
a.  Rack
b.  3 # Pair Beauty Bells
c.  5 # Pair Beauty Bells
d.  8 # Pair Beauty Bells
e.  10 # Pair Beauty Bells
f.  12 # Pair Beauty Bells
5.  Incline Bench
6.  Flat Bench
7.  Beauty Bars
8.  Swiss Facial Unit
9.  Treadmills
10.  Hip & Leg Beautifier
11.  Leg Kick Machine
12.  Double Twistaway
13.  Butterfly
14.  Contour Mould Unit, consisting of
a.  Board
b.  Weight Jacket
15.  Low Roller
16.  High Roller
17.  Chair Roller
18.  Vibrator Belt
19.  Swivelator
20.  Health Step
21.  Scale
22.  Inhalator
23.  Plate Weights

is provided to accomplish weight loss or gain, apportionment of body dimensions and general conditioning of its users' bodies.

We recognize that there are some elements of fun, relaxation and entertainment derived from many phases of man's daily activities and could well be experienced by some individuals in some of the exercise regimen and programs offered by the defendant clubs. On the other hand, we doubt that the rigors of the exercise and other activities in which overweight and unshapely female patrons of the clubs must participate to achieve their desired goals and the ultimate benefits offered by the clubs' programs can be regarded as entertainment of a nature which would cause the clubs to be brought within the Act's coverage. Surely, one who executes the exercises and performs the activities required by the program and upon completion of the course has achieved the maximum benefits possible for that individual may derive great personal satisfaction and joy, and, looking back, describe the experience as fun. But those who do not accomplish as much likely would experience disappointment and frustration and condemn the whole affair as an ordeal.

The prime purpose of the clubs and its members is the very serious one of improving physical well-being and any resultant entertainment flowing from use of the clubs' facilities and execution of their programs would be nominal and on an individual, and not public, basis.

We are aware that in United States v. DeRosier, *supra*, the court held that defendant's Northwood Bar was a "place of entertainment" and therefore a "place of public accommodation" under the 1964 Civil Rights Act because of the presence of three coin operated devices which provided the defendants with 3% of the gross revenue of the bar. That court did not consider the three coin operated machines to be insignificant.[5] But we note that a bar, by its very nature, provides its patrons with such pleasant diversions as drinking various beverages, watching television, visiting with friends and playing cards and other games. Most bars, when taken in their entirety, provide amusement and diversion for their patrons. Also, by their own nature, the following establishments provide amusement and diversion when taken in their entirety and fit into the category of a "place of exhibition or entertainment":

1. An amusement park—Miller v. Amusement Enterprises, Inc., *supra.*

2. A roller skating rink—Evans v. Seaman, 452 F.2d 749 (5 Cir. 1972).

3. Swimming and dancing complex— United States v. Johnson Lake, Inc., 312 F.Supp. 1376 (S.D.Ala. 1970).

4. The educational, spiritual and recreational programs of the Y.M.C.A.[6] Smith v. YMCA of Montgomery, 462 F.2d 634 (5 Cir. 1972).

5. Swimming, boating, picnicking, sunbathing and dancing facilities and a miniature golf course—Daniel v. Paul, *supra.*

Defendant Shape Spas do not belong in such category.[7]

5. But see the dissent of Judge Godbold at 757 regarding the application of a *de minimus principal* and page 758(f) where Judge Godbold summarized his views and stated: "If the particular devices are not part of the normal appurtenances of a bar, and if we are to measure departure from the norm by the presence of mechanical amusement devices, the departure in this instance is too nominal to impose coverage."

6. Plaintiffs, in their reply memorandum, contend that *Smith* stands for the proposition that a gymnasium is a place of amusement or diversion. It should be noted that the basis for decision in *Smith* was that the YMCA, not its gymnasium, was a "public accommodation" because it presented numerous recreational activities open to the general public (which is not the case for Shape Spa, which had a members only policy). The Montgomery YMCA, which was supported by state action and acted under "color of law", freely admitted without question all who applied. 462 F.2d at 648. Such is not the case here.

7. Since we have concluded that defendant health clubs are not "places of entertainment", we need not consider whether the defendant clubs "serve the public" and "affect com-

Accordingly, the defendants' motion for summary judgment should be, and the same is hereby, granted and the plaintiffs' motion for partial summary judgment is hereby denied.

March 5th, 1974.

merce". However, it does appear from the record that defendant health clubs are "simply businesses operated for a profit with none of the attributes of self-government and member ownership traditionally associated with private clubs." See Daniel v. Paul, *supra*, 395 U.S. at 301, 89 S.Ct. at 1699. It is important here that we point out that there is a question whether or not the defendant health clubs serve the general public. Exhibit "D", which is the membership contract, requires the prospective member to disclose a substantial amount of credit information. Members must also be physically sound and have medical approval to proceed with a normal routine of exercises. It therefore appears from the record that defendant health clubs do not serve the public generally, but instead, they only serve those members of the public who have good credit, are physically sound, and have medical approval

to exercise. See Gardner v. Vic Tanny Compton, Inc. (1960), 182 Cal.App.2d 506, 6 Cal. Rptr. 490, 87 A.L.R.2d 113, holding that an operation similar to defendant health clubs was not a place of public amusement or accommodation under the California civil rights law.

At least 90% of the gym equipment was manufactured outside Louisiana and "moved" in interstate commerce. Defendant clubs are used by 9,000–12,000 members per year, some of whom are members of out of state health clubs to whom defendant clubs are made available on a reciprocal basis. Defendants also advertise on television and in New Orleans' newspapers, media which cross state lines. These facts would support a finding, if we were required to make such a finding, which we are not, that the defendant health clubs affect commerce.