PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JEAN DENNY; SEANDRIA DENNY,
      *Plaintiffs-Appellants,*

v.

ELIZABETH ARDEN SALONS,
INCORPORATED,
      *Defendant-Appellee.*

No. 05-1228

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-04-588-1)

Argued: May 25, 2006

Decided: August 9, 2006

Before WILKINSON, NIEMEYER, and KING, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer joined and in which Judge King joined as to Parts III and IV. Judge King wrote an opinion dissenting in part.

---

## COUNSEL

**ARGUED:** James Arthur DeVita, Arlington, Virginia, for Appellants. Benjamin Gaillard Chew, PATTON BOGGS, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** Stephanie J. Quincy, Rachel M. Bacalzo, SHERMAN & HOWARD, L.L.C., Phoenix, Arizona, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

In this case an African American woman bought her mother a gift package from a beauty salon and day spa. Upon visiting the salon to check on her mother and to add a hair coloring to the package, a receptionist told her that there was "a problem" because the salon did not "do black people's hair." The mother and daughter brought this suit against the salon under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. (2000), which prohibits racial discrimination in a "place of public accommodation," and under 42 U.S.C. § 1981, which disallows such discrimination in the making and enforcing of contracts. Plaintiffs also asserted a state law claim for intentional infliction of emotional distress. The district court granted summary judgment to the salon on all claims.

We hold that the district court properly dismissed plaintiffs' Title II claim, because the salon is not a "place of public accommodation," as that term is defined in the statute. Congress has clearly delineated those entities that fall within Title II's ambit, and we are not at liberty to go beyond what it has plainly enacted. But neither can we disregard a congressional edict that proscribes racial discrimination in the contractual setting. We thus hold that the district court erred in dismissing plaintiffs' § 1981 claim, because plaintiffs have presented sufficient evidence to create a triable dispute of fact over whether the salon engaged in the form of discrimination that § 1981 expressly prohibits. Finally, we conclude that the district court appropriately dismissed plaintiffs' state law claim. We thus affirm in part and reverse in part and remand for further proceedings.

I.

Plaintiffs are Seandria Denny and her mother, Jean Denny. They are African American. Defendant is Elizabeth Arden Salons, Inc., which operates Red Door Salon and Spa, an upscale beauty salon and day spa with locations in Virginia and several other states. The salon offers its customers a variety of different beauty services, including hair, skin, and nail care, makeup artistry, and massages, facials, and other body treatments.

The dispute in this case arose from incidents at a Red Door salon in the Tysons Corner Shopping Center in Northern Virginia. On May 26, 2002, Seandria Denny visited the salon to purchase a gift for her mother. She decided to buy Elizabeth Arden's $295 "Miracle Morning" package, which included a massage, facial, manicure, hair style, and lunch. Four days later, Jean Denny went to the salon to redeem her gift package. She received a facial and massage, and the salon then provided her with a salad for lunch. She obtained these services without incident, and planned to have her hair styled after lunch.

While Jean Denny was being served, Seandria Denny called the salon to request that it also color her mother's hair. Over the phone, the employee with whom she spoke agreed that the salon would perform the coloring. Seandria Denny indicated that she would arrive at the salon shortly to pay for the hair coloring (which cost extra) and to see how her mother was doing. Upon her arrival, she approached the receptionist, Raha Ashrafi, and told her that she would like to check on her mother. Ashrafi responded, "[w]ell, Ms. Denny, I think we have a problem." The salon, she explained, did not "do black people's hair." Denny suggested that her mother's hair was straight and similar to Caucasian hair, but Ashrafi continued to maintain that the salon did not do African American hair. Ashrafi indicated that the salon's manager, Chelsey Orth, would shortly be able to speak with Denny.

According to Seandria Denny, upon Orth's arrival, Orth reiterated the salon's refusal to work on Jean Denny's hair. Seandria Denny, outraged, suggested that one of the salon's eight or nine hair stylists should be able to do her mother's hair. Orth responded, however, that she had discussed the situation with each stylist, and all had refused. Seandria Denny told the salon not to touch her mother's hair and that she wanted her mother to leave once she was done with her massage. She then exited the salon, without having seen her mother during the visit. The record is unclear what treatments Jean Denny had received at the time her daughter left the salon.

Orth remembers the events quite differently. She contends that she spoke with Seandria Denny only about her mother's hair coloring. Since the hair coloring would have added an hour to Jean Denny's visit, Orth was unable to include it on such short notice. Orth claims

that she explained this to Jean (but not Seandria) Denny, who responded that she did not want her hair colored in any event. Seandria Denny disputes that anyone from Elizabeth Arden ever suggested to her that the hair coloring could be done on a different day.

After Jean Denny had eaten lunch, one of Elizabeth Arden's employees shampooed her hair. Denny then had to wait approximately ten to fifteen minutes for a hair stylist, which, in her opinion, was a little long as compared to other customers. The hair stylist appears not to have asked Jean Denny how she wanted her hair styled, and Denny did not instruct her. Denny expected that the hair stylist would use hot curlers, but the stylist only blow-dried and round brushed Denny's hair. When she had finished, she gave Denny a mirror to view her hair, but never asked Denny if she approved. Denny was shocked when she saw her hair, because the stylist had left it looking like "a bush."

Jean Denny was so surprised and embarrassed by her hair's appearance that she wanted to leave immediately. Without expressing disapproval, Denny got out of the chair, grabbed her coat, and quickly left for her car. She did not stay for the manicure that was included in her package, and did not ask for her money back. She went home, to find her daughter waiting for her. Seandria Denny was aghast when she saw her mother's hair, and furious that the salon had disregarded her instructions not to touch it. The next day, Jean Denny washed and styled her own hair.

Plaintiffs filed suit against Elizabeth Arden on May 20, 2004. They brought two discrimination claims, one under Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a et seq. (2000), and the other under 42 U.S.C. § 1981. They also alleged a claim of intentional infliction of emotional distress under Virginia law. Elizabeth Arden moved for summary judgment, which the district court granted. The district court first held that Title II did not cover the salon. It then concluded that plaintiffs did not proffer evidence sufficient to illustrate either that they were discriminated against in the making and enforcing of a contract under § 1981 or that their emotional distress was severe.

## II.

Plaintiffs first argue that the district court improperly dismissed their Title II claim. Title II entitles individuals "to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). It sets forth a comprehensive list of establishments that qualify as a "place of public accommodation," *id.* § 2000a(b), and in so doing excludes from its coverage those categories of establishments not listed. Places of public accommodation include: (1) hotels and other businesses providing "lodging to transient guests," *id.* § 2000a(b)(1); (2) restaurants and other facilities "principally engaged in selling food for consumption on the premises," *id.* § 2000a(b)(2); (3) "place[s] of exhibition or entertainment," *id.* § 2000a(b)(3); and (4) establishments that are, inter alia, within a covered establishment, *id.* § 2000a(b)(4). Whether an entity qualifies as a "place of public accommodation" can be a fact-intensive inquiry, because establishments "differ markedly in their operations." *Nesmith v. YMCA of Raleigh, N.C.*, 397 F.2d 96, 98 (4th Cir. 1968).

Plaintiffs rely on only one subsection of Title II's definition provision, contending that the salon is a "place of entertainment" under § 2000a(b)(3). Section 2000a(b)(3) defines "place of public accommodation" to include "any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment." *Id.*

We cannot agree with plaintiffs' argument. The plain text of the statute demonstrates that beauty salons are not covered by Title II. They are not mentioned in any of the numerous definitions of "place of public accommodation." They also bear little relation to those places of entertainment that are specifically listed, which strongly suggests that a salon would not fall within the catchall language "other place of exhibition or entertainment." 42 U.S.C. § 2000a(b)(3). As the Supreme Court has indicated, "the statutory language 'place of entertainment' should be given full effect according to its *generally accepted* meaning." *Daniel v. Paul*, 395 U.S. 298, 308 (1969) (emphasis added). A "place of entertainment" is one whose particular

purpose is to entertain. *See The Random House Dictionary of the English Language* 1478 (2d ed. 1987) (defining "place" as, inter alia, "a space, area, or spot, *set apart or used for a particular purpose*: a place of worship; a place of entertainment") (emphasis added). Unlike a theater, concert hall, or sports arena — all of which are specifically designed to entertain their patrons — the principal function of the salon in this case is to offer its customers hair, skin, and body care. Visiting a salon does not fairly approximate the experience of attending a movie, symphony, or sporting match. Rather, the salon is more similar to businesses that offer tangible services, not entertainment.

Our friend in dissent would have us believe that Elizabeth Arden was doing anything other than styling hair and providing other beauty services, but such treatments were of course central to its business. Indeed, the styling of Jean Denny's hair is what this entire dispute is all about. This is not enough to transform a beauty salon into a "place of entertainment" remotely akin to the movies, concerts, and sports facilities Congress listed in the statute. Unfortunately, the dissent takes such an expansive view of the term "place of entertainment" that an automobile repair shop is apparently the only thing that does not fit within it. *See infra* at 17, 19 n.6.

The other subsections setting forth Title II's definition of "place of public accommodation" reinforce the ordinary textual reading that "place of entertainment" refers to those establishments designed to entertain. *See* 42 U.S.C. § 2000a(b). For Congress specifically included within Title II other service establishments, such as hotels and restaurants, *see id.* § 2000a(b)(1)-(2), and it chose not to cover with particularity facilities that sell salon services. If, however, Congress had intended for "place of entertainment" to encompass any service establishment with tangential entertainment value, there would have been no reason for Congress to include separate subsections for hotels, restaurants, and similar establishments in the statute. Thus to include in the statute all places where patrons might go in some part for relaxation, as the dissent would have it, renders unnecessary the entire exercise in statutory draftsmanship that Congress undertook in 42 U.S.C. § 2000a(b). We therefore decline to allow plaintiffs to bootstrap defendant's establishment into the "place of entertainment" provision, and thereby circumvent the congressional balance evidenced in § 2000a(b).

The case law delimiting the breadth of § 2000a(b)(3) also supports the plain and ordinary meaning of "place of entertainment." In *Paul*, the Supreme Court held that "a 232-acre amusement area with swimming, boating, sun bathing, picnicking, miniature golf, dancing facilities, and a snack bar" was a place of entertainment. 395 U.S. at 301, 306. The Court explained that the phrase should be interpreted in accord with its ordinary meaning to include both those "establishments where patrons are entertained as spectators or listeners" and "those where entertainment takes the form of direct participation in some sport or activity." *Id.* at 306 & n.7, 308. As *Paul* illustrates, a place of entertainment is one designed to entertain its patrons, even if a customer participates in the entertainment.

The salon in this case — primarily offering body maintenance services with tangential entertainment value — does not readily compare to the "amusement business" in *Paul*, whose raison d'être was to sell entertainment to its customers. 395 U.S. at 301. Nor are the salon's services analogous to the great bulk of establishments that lower courts have held to be places of entertainment: most have had amusement and recreational elements front and center. *See, e.g.*, *United States v. Greer*, 939 F.2d 1076, 1091 n.15 (5th Cir. 1991) (public parks); *United States v. Lansdowne Swim Club*, 894 F.2d 83, 87 (3d Cir. 1990) (community swimming facility); *Smith v. YMCA of Montgomery, Inc.*, 462 F.2d 634, 636, 648 (5th Cir. 1972) (YMCA that offered "numerous recreational activities, such as swimming, scuba diving, table tennis, basketball, [and] tennis" and also maintained several recreational facilities, including "five gymnasiums, a health club, and eight swimming pools"); *Evans v. Seaman*, 452 F.2d 749, 751 (5th Cir. 1971) (roller skating rink); *United States v. Cent. Carolina Bank & Trust Co.*, 431 F.2d 972, 973-74 (4th Cir. 1970) (golf course); *Scott v. Young*, 421 F.2d 143, 144-45 (4th Cir. 1970) (recreational area that was "a virtual carbon copy" of the business in *Paul*); *Miller v. Amusement Enters., Inc.*, 394 F.2d 342, 351 (5th Cir. 1968) (en banc) (amusement park); *see also Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1269 (7th Cir. 1993) (noting that § 2000a(b)(3) includes "bowling alleys, golf courses, tennis courts, gymnasiums, swimming pools and parks"); *Nesmith*, 397 F.2d at 100 (suggesting that a YMCA's "swimming pool, gymnasium and exercise activities" might fall under § 2000a(b)(3)).

Plaintiffs — and the dissent — have not directed us to even a single case in which a court has found that Title II covered a salon like the instant one. In fact, in the one case presenting facts most similar, the court held that a hair salon was not a "place of entertainment." *See Halton v. Great Clips, Inc.*, 94 F. Supp. 2d 856, 862 (N.D. Ohio 2000). The *Halton* court found that such a salon fell outside the ordinary meaning of the phrase. *Id.* It went on to explain that had Congress wished to include a salon within Title II, it could have easily done so. *Id.*; *see also Pinkney v. Meloy*, 241 F. Supp. 943, 947 (N.D. Fla. 1965) (quoting legislative history from Title II indicating that "barber shops, beauty parlors and other establishments are not covered [by the Act] unless they are contained within a hotel"). Congress has, for instance, specifically listed beauty shops as "public accommodations" covered by the Americans with Disabilities Act. *See Halton*, 94 F. Supp. 2d at 862-63 & n.7 (citing 42 U.S.C. § 12181(7)(F)).

Plaintiffs primarily rely on *Rousseve v. Shape Spa for Health & Beauty, Inc.*, 516 F.2d 64, 65 (5th Cir. 1975), which held that a health and exercise studio was a place of entertainment. To be sure, the health club in *Rousseve*, like the salon in this case, offered its clients massages and facials. *See id.* at 67. But the similarities end there. The health club in *Rousseve* supplied its customers with recreational areas and facilities, such as gymnasium equipment and swimming pools, that are conspicuously absent in the present case. *Id.* Indeed, plaintiffs overlook the fact that the *Rousseve* court explicitly indicated that the health club's facilities were akin to those provided by the YMCA, which the Fifth Circuit had already found to be a place of public accommodation. *Id.* at 68 (citing *Smith*, 462 F.2d at 648). Simply put, *Rousseve* cannot provide plaintiffs with the cornerstone necessary to support their atextual construction of Title II.[1]

---

[1]Our dissenting friend alights on the term "spa" as distinguished from "salon." But this distinction is one without a difference. For the statute requires an establishment to be a "*place* of entertainment," rather than a service establishment with incidental relaxation value. Thus the fact that Elizabeth Arden writes the word "spa" above its doorpost no more converts its beauty service business into a "*place* of entertainment" than does the fact that some clients might find hair styling and beauty treatments relaxing. Indeed, the "spa" cases on which the dissent relies differ markedly from Elizabeth Arden — they offered YMCA-like facilities with, inter alia, gyms, exercise equipment, and fitness classes.

As the foregoing discussion of statutory text and case law makes clear, Title II approached the question of what is an establishment not through a generic definition, but through a series of extended lists. Indeed, § 2000a(b) lists no fewer than fourteen examples of establishments, and subsection (b)(3) lists no fewer than five different places of entertainment. Barber shops and beauty salons are sufficiently common and pervasive that we cannot casually attribute their omission to mere oversight. Indeed, it would have been easy enough for Congress to have included them. And while some of the salon's services might have provided its customers with relaxation, the salon is not a "place of entertainment" within the meaning of Title II, because it is designed to market high-quality hair, skin, and body care, not amusement. We note, however, that we have interpreted the statute as it does read, not perhaps as it should read. One can think of good reasons why Title II should include both beauty salons and barber shops, even those catering to specific clienteles. That, however, is a matter for legislative debate. It remains our job to respect what Congress has said, not to put words in its mouth.

## III.

Plaintiffs next contend that the district court committed error when it dismissed their § 1981 claim. Section 1981 establishes that "[a]ll persons . . . have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). It defines "make and enforce contracts" to include "the making, performance,

---

Moreover, our dissenting brother travels far afield to obscure the issue in this case. In an attempt to demonstrate that its view of the term "entertainment" is not infinitely elastic, the dissent first offers up, albeit only illustratively, an auto repair shop as something not designed to entertain. Then, it offers, but again only illustratively, visions of "resorts" and of a Belgian town known for the curative properties of its mineral springs. For good measure, we are told about a 7,800 square-foot day spa and clubhouse in Avignon, France, and that Guantanamo is not a spa. *See infra* at 20-21. Apparently, there are spas and there are spas. All this globetrotting, interesting as it might be, has unfortunately little enough to do with the defendant's business or the statutory text or structure with which the dissent has yet to deal.

modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To prove a § 1981 claim, therefore, a plaintiff must ultimately establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest. *See, e.g.*, *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004); *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751-52 (5th Cir. 2001); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413-15 (7th Cir. 1996).

There can be no doubt that plaintiffs have presented not only strong but direct evidence of the salon's intent to discriminate.[2] *See Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). Indeed, plaintiffs have presented evidence that suggests the salon refused to perform on a contract — either denying plaintiffs a hair styling, hair coloring, or both — for an explicit race-based reason. This is what § 1981 forbids.

In fact, it is hard to imagine plainer evidence of purposeful discrimination than when services are denied expressly because the purchaser is African American. When Seandria Denny arrived to pay for her mother's hair coloring, the receptionist explained that the salon did not "do black people's hair." Denny also alleges that Chelsey Orth, the salon's manager, confirmed this view from management's perspective. Orth further explained that each and every one of the eight or nine hair stylists present refused to work on Jean Denny's hair. While there may be a more benign explanation for the salon's refusal to fully serve plaintiffs, the receptionist's overt racial explanation creates a triable dispute. *See Williams*, 372 F.3d at 667.

There can likewise be no doubt that plaintiffs have demonstrated

---

[2]When a plaintiff has presented no direct evidence of the defendant's discriminatory intent, we have applied the familiar *McDonnell Douglas* framework to § 1981 claims involving contracts for the purchase of goods or services. *See Williams*, 372 F.3d at 667; *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Plaintiffs do not make use of this framework here, however, and instead rely on direct evidence of the salon's discriminatory intent.

a concrete contractual relationship. "[A] plaintiff must establish the loss of an actual, not speculative or prospective, contract interest." *Dillard*, 277 F.3d at 751. Seandria Denny bought an expensive gift package that gave her mother the specific contractual right to receive a massage, facial, manicure, lunch, and hair style. She also reached an agreement with the salon's receptionist over the phone to add a hair coloring to the package. These transactions plainly satisfy § 1981's contract requirement.

This case is different therefore from those where a plaintiff's failure to advance a pending or current contractual relationship proved fatal to a § 1981 claim. *See, e.g.*, *Dillard*, 277 F.3d at 751-53 (dismissing § 1981 claim when defendant retail establishment banned plaintiff from its premises after her alleged shoplifting because plaintiff failed to "offer evidence of some tangible attempt to contract with [defendant]"); *Office Max*, 89 F.3d at 414-15 (dismissing § 1981 claim when defendant retail establishment summoned "the police to 'check out' African-American patrons" because the patrons could not point to the "actual loss of a contract interest" resulting from defendant's conduct). In this case, by contrast, the beauty establishment offered in advance a carefully crafted package for a specified price. Seandria Denny's purchase of the package for her mother operated as an acceptance, and the existence of the contractual relationship cannot be in serious question.

We do not suggest, of course, that every person who walks into a commercial establishment and is denied service or is otherwise dissatisfied can maintain a § 1981 cause of action. Beauty salons cater uniquely to taste, and loss of business — not litigation — is the usual cost of customer dissatisfaction. We do not have before us, however, the question of whether Denny did or did not receive hair styling to her liking, but whether for reasons of race she was denied hair styling altogether or in any meaningful sense of the term. Defendant argues that the § 1981 claim fails because plaintiffs received all the services for which they contracted. *See, e.g.*, *Williams*, 372 F.3d at 667 (plaintiff must show that "he was denied the opportunity to contract for goods or services"). At this stage of litigation, however, defendant's argument fails: there is sufficient disagreement on this material fact to withstand summary judgment with respect to Jean Denny's hair styling and hair coloring.

To begin with, the salon offered insufficient evidence that its employees came close to styling Jean Denny's hair. Denny received a shampoo, brush, and blow dry. This combination left her hair looking like "a bush." The record provides no indication of what Elizabeth Arden considers a "hair style," and in view of the evidence before us, we cannot conclude summarily that the contract was ever performed. Indeed, defendant's employees themselves expressed an unwillingness to perform, telling Seandria Denny that her mother's race prevented it. Moreover, if Jean Denny did in fact receive a hair style, it was no large task for the salon to so prove — by way of advertisements, its employees, or customary standards of salon service. But again, the salon made essentially no effort to rebut plaintiffs' claim that they did not receive for racial reasons the basic service for which they contracted.

There is also a genuine issue of material fact concerning whether the salon refused to provide a hair coloring on the basis of race. According to Seandria Denny, one of defendant's employees agreed over the phone that the salon would color her mother's hair. When Seandria Denny arrived at the salon to pay for the coloring, however, the receptionist backpedaled and told her that the salon did not "do black people's hair." While Orth, the salon's manager, suggests that the salon did not have time to color Jean Denny's hair, Seandria Denny was never so informed. And though the true basis of the decision may be in some dispute, what is not disputed is that Jean Denny never received a hair coloring. Defendant's contention that Jean Denny may not actually have wanted her hair colored ignores the fact that this was a third-party beneficiary contract. *See, e.g.*, *Levine v. Selective Ins. Co. of Am.*, 462 S.E.2d 81, 83 (Va. 1995). Seandria Denny, the purchaser, wanted to buy her mother a gift and was refused that opportunity on race-based grounds. If the salon refused to contract with Seandria Denny because of her mother's race, that is all that § 1981 requires.

It is, of course, entirely possible that the trier of fact may ultimately see this matter Elizabeth Arden's way. The record before us, however, at least draws into serious question the neutral and non-racial explanations for whatever happened here.

IV.

Plaintiffs lastly argue that the district court erred in dismissing their state claim of intentional infliction of emotional distress. We disagree. This tort is "not favored" under Virginia law, *Ruth v. Fletcher*, 377 S.E.2d 412, 415 (Va. 1989) (internal quotation marks omitted), and liability only arises if, inter alia, a defendant's conduct results in severe emotional distress "that no reasonable person could be expected to endure," *Russo v. White*, 400 S.E.2d 160, 163 (Va. 1991).

Plaintiffs have failed to present evidence that they suffered sufficiently severe distress. They have alleged that defendant's conduct made them nervous, caused them stress, and resulted in an inability to adequately sleep and eat. It is not to minimize these effects to say that they fall short under Virginia law. Plaintiffs make no claim "that [they] had any objective physical injury caused by the stress, that [they] sought medical attention, that [they were] confined at home or in a hospital, or that [they] lost income." *Russo*, 400 S.E.2d at 163 (dismissing claim where plaintiff only alleged nervousness, stress, and inability to sleep or concentrate at work); *see also Harris v. Kreutzer*, 624 S.E.2d 24, 34 (Va. 2006) (same). If the distress plaintiffs allege was sufficient to be actionable, courts could become arbiters of every human interaction that culminated in embarrassment, disappointment, or hurt feelings. Virginia law has refused to countenance this possibility, and the district court properly dismissed plaintiffs' state law claim.

V.

While Title II clearly excludes this salon from coverage, section 1981 just as clearly governs racial animus in the making and enforcement of contracts. Our distinguished colleague in dissent simply overlooks the fact that the Reconstruction Congress and the 1964 Congress went about their work in different ways. The Reconstruction Congress wrote broadly, and we have given effect to that breadth as expressed in section 1981. The 1964 Congress also wrote broadly, but made clear through a series of specific references that Title II's reach, while ample, was not wholly without limit. Courts can no more place words in Title II than they can ignore the core command of § 1981. Since plaintiffs have proffered sufficient evidence that the salon dis-

criminated against them on the basis of race in its performance of contractual obligations, their § 1981 claim must survive summary judgment.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*

KING, Circuit Judge, dissenting in part:

Although I readily concur in the majority's reinstatement of the Dennys' § 1981 claim (Part III), and in its disposition of their state-law claim (Part IV), I disagree with Part II of the majority opinion. In my view, the majority has erred in ruling that the Elizabeth Arden Red Door Salon and Spa (the "Red Door Spa," or the "Spa") falls outside the ambit of the Civil Rights Act of 1964. As I see it, the majority's analysis suffers from two fatal errors. First, it fails to adhere to controlling precedent and accord proper effect to the broad statutory language of section 201 of the Civil Rights Act, *codified at* 42 U.S.C. § 2000a (the "Public Accommodations Statute," or the "Statute"). Second, its reasoning relies on a crucial factual misapprehension — that the Red Door Spa is merely a hair salon when, in fact, it is much, much more.

I would recognize the Red Door Spa for what it is — a place of public accommodation within the meaning of the Public Accommodations Statute. And I would reverse the district court, reinstating the Dennys' claim that Elizabeth Arden denied them the full and equal enjoyment of the Spa's services because they are African-American (the "Public Accommodations Claim").

I.

In assessing the district court's award of summary judgment to Elizabeth Arden, we are obliged to view the facts, and the reasonable inferences to be drawn therefrom, in the light most favorable to the Dennys. *See Baqir v. Principi*, 434 F.3d 733, 741 (4th Cir. 2006).

Assessed in that light, the record discloses the following: The Red Door Spa, located directly across from the Tyson's Corner Shopping Center in Vienna, Virginia, is open to the public, and its operations affect interstate commerce. According to its website, the Spa offers "a *complete* menu of salon and spa services," including "signature skincare, massage and body treatments, nail services, hair design, makeup artistry, and *much, much more*." J.A. 65 (emphasis added).[1] These services include the "elemental balancing massage," which, the website declares, "has been called an 'out of body experience' by many of our guests." *Id.* Moreover, one of the Spa's advertising brochures lists the various packages it offers — with names such as the "Red Door Rescue," the "Miracle Morning," and the "Executive Escape" — that include such services as "Purifying Scented Body Wrap[s]," "Desert Stone Massage[s]," and "Swedish Massage[s]." J.A. 66.

On May 26, 2002, Seandria Denny purchased a gift package from the Red Door Spa for her elderly mother, Jean, who was in her seventies. The gift package, called the "Miracle Morning" by the Spa, sold for the sum of $295 and included a Swedish body massage, a "Red Door Facial," a "Warm Cream" manicure, hair styling, makeup application, and a "Spa" lunch. J.A. 65. Jean Denny went to the Spa on May 30, 2002, to redeem her Miracle Morning gift package and, while Jean was obtaining her spa services, her daughter Seandria decided to augment the gift by the additional purchase of a hair coloring for her mother. Seandria then telephoned the Spa, arranged to purchase the hair coloring, and drove to the Spa to pay and to check on her mother.

When Seandria arrived at the Red Door Spa and sought to pay for Jean's hair coloring, however, she was advised by the Spa's receptionist that "we have a problem." J.A. 73. Seandria inquired promptly about the "problem," and the receptionist made the racist response that the Spa did not "do black people's hair." *Id.* When Seandria protested that "[t]here is no such thing as black people's hair," the receptionist reiterated: "I'm sorry, we just don't do it. If you don't mind sitting down, I will have my manager come talk to you and explain to you what's going on." *Id.* Shortly thereafter, the Spa's manager

---

[1]The citations to "J.A. ___" refer to the contents of the Joint Appendix.

approached Seandria and advised her that "every single one" of the eight or nine hair stylists on duty had "refused" to color Jean's hair. *Id.* at 74. Continuing, the manager explained that "20 years ago they were all required and trained to do black people's hair, but in this day and age it is not required." *Id.*

II.

A.

The Public Accommodations Statute guarantees that, in this country, "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined [herein]," irrespective of their race or color. 42 U.S.C. § 2000a(a). The Supreme Court has recognized that the Statute's "overriding purpose" is "to remove the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public." *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (internal quotation marks omitted). Accordingly, the Court has mandated that we read the Statute carefully, in a manner consistent with its broad purpose and language.

Pursuant to the Public Accommodations Statute, a "place of public accommodation" has three characteristics: (1) it "serves the public"; (2) it "affects interstate commerce"; and (3) it falls within one of four categories enumerated. *See* § 2000a(b). According to Elizabeth Arden and the majority, the Red Door Spa does not constitute a "place of public accommodation" under the Statute because it does not fit into any of the four categories enumerated in § 2000a(b). I strenuously disagree, and submit that the Spa falls squarely within the third such category, § 2000a(b)(3).

Section 2000a(b) includes, as a place of public accommodation, "any motion picture house, theater, concert hall, sports arena, stadium *or other place of exhibition or entertainment*." *See* § 2000a(b)(3) (emphasis added). And the Supreme Court, in addressing the Statute's breadth, has determined that "the statutory language 'place of entertainment' should be given full effect according to its generally accepted meaning." *Daniel*, 395 U.S. at 308. According to the Court,

even though "most of the discussion in Congress regarding the cover-age of [the Public Accommodations Statute] focused on places of spectator entertainment[,] . . . a natural reading of its language would call for broader coverage." *Daniel*, 395 U.S. at 307-08. To illustrate, Justice Brennan quoted from *Webster's Third New International Dictionary*, defining "entertainment" as "the act of diverting, amusing, or causing someone's time to pass agreeably." *Id.* at 306 n.7. Having so construed the "place of entertainment" provision of the Statute, Justice Brennan had little difficulty concluding for the Court that the recreation area at issue in *Daniel* constituted a "place of public accommodation" under the Statute. *Id.* at 308.[2]

Pursuant to the settled principles of *Daniel*, the facilities enumerated as "place[s] of exhibition or entertainment" in § 2000a(b)(3) are unified by their common purpose of providing relaxation, amusement, recreation, and the like. And whether a particular business establishment constitutes such a "place of entertainment" is determined by a fact-bound inquiry into the facility's purposes. *See United States v. Cent. Carolina Bank and Trust Co.*, 431 F.2d 972, 974 (4th Cir. 1970) (focusing on golf pro shop's purpose as adjunct to golf course and concluding that pro shop was "place of entertainment"). For example, few persons visit auto mechanics to be amused or diverted, and an auto mechanic's shop thus would not likely constitute a "place of entertainment" under the Public Accommodations Statute, even though it might provide its waiting customers with a television for casual viewing.[3] By contrast, an amusement park —— featuring roller coasters —— derives its business from those who seek the thrills associated with speed and heights, and is thus "a place of entertainment" within the Statute, notwithstanding that its primary method of

---

[2]There was no dissent in *Daniel* from Justice Brennan's handling of the "place of entertainment" issue. Justice Black, the lone dissenter, wrote that he "could and would" agree with the Court's holding (including its statutory interpretation) if Congress had enacted the Public Accommodations Statute pursuant to the Fourteenth Amendment, rather than the Commerce Clause. *See Daniel*, 395 U.S. at 309 (Black, J., dissenting).

[3]As the qualifier "[f]or example" demonstrates, the hypothetical auto mechanic's shop is just one of the entities that might not be a "place of entertainment" under the Statute. *See ante* at 6.

entertainment differs from that offered by motion picture houses, the-aters, concert halls, or sports arenas.

Business entities that provide their customers with physical and personal care services exist along a spectrum from the purely utilitar-ian to the entertaining. As a general proposition a traditional barber shop (providing hair cuts only) may not fit into any ordinary defini-tion of a "place of entertainment." *See Halton v. Great Clips, Inc.*, 94 F.Supp. 2d 856, 862 (N.D. Ohio 2000) (concluding that establishment which provided only "hair services" was not "place of entertainment" under § 2000a(b)(3)). On the other hand, those business entities that exist to pamper, amuse, or provide recreation to their customers plainly have the purpose of entertaining, and thus fall within the Pub-lic Accommodations Statute's "broad[] coverage." *See Daniel*, 395 U.S. at 307; *Rousseve v. Shape Spa for Health and Beauty, Inc.*, 516 F.2d 64, 67-68 (5th Cir. 1975) (concluding that defendant's health spa is "place of entertainment"); *Johnson v. Brace*, 472 F.Supp. 1056 (E. D. Ark. 1979) (same); *see also Halton*, 94 F.Supp. 2d at 862 ("Courts have found covered establishments include, *inter alia*: health spas, golf courses, and beach clubs . . . .").[4]

My good friends in the majority erroneously conclude that the Red Door Spa is not a place of public accommodation, reasoning that "the plain text of the [S]tatute demonstrates that beauty salons are not cov-ered by [it]," because "[t]hey are not mentioned in any of the numer-ous definitions of 'place of public accommodation,'" and "[t]hey also bear little relation to those places of entertainment that are specifically listed." *Ante* at 5; *see also id.* at 6 (stating that "a beauty salon" is not "remotely akin to the movies, concerts, and sports facilities Congress listed in the statute"). The Court in *Daniel*, however, specifically rejected the *ejusdem generis* conclusion that places of entertainment

---

[4]The Public Accommodations Statute applies to all "*place[s]* of public accommodation," and includes therein all "*place[s]* of . . . entertain-ment." *See* § 2000a(a) & (b)(3) (emphasis added). Accordingly, I view the majority's assertion that "the styling of Jean Denny's hair is what this entire dispute is all about" as incorrect and largely irrelevant. *See ante* at 6. There is no basis for concluding that a "place of entertainment" is freed from the Statute's prohibition against racial discrimination simply because it also provides some service that is not "entertaining."

"should be restricted to the primary objects of Congress' concern" — that is, motion picture houses, theaters, concert halls, sports arenas, and stadiums, as expressly enumerated in § 2000a(b)(3) — because "a natural reading" discloses the Statute's "broader coverage." *See* 395 U.S. at 307.[5] Indeed, any business entity that has the specific purpose of providing "entertainment," as that term is generally understood, is covered by the Statute's broad reach. *See id.*[6]

In seeking to distinguish *Daniel*, the majority, as it must, focuses on the decision's result — that the 232-acre amusement area in question was a place of entertainment — and fails to adhere to the Court's broad construction of "place of entertainment." *Compare ante* at 7, *with Daniel*, 395 U.S. at 307-08. We are bound, however, by the Court's construction of § 2000a(b)(3) in *Daniel*, which has constituted controlling precedent for thirty-six years. If Congress had desired to overrule *Daniel* in favor of some narrower interpretation, it could easily have amended § 2000a(b)(3) to read, in relevant part, "or other *similar* place of exhibition or entertainment." In the absence of such Congressional action, we are obliged to apply *Daniel*'s broad construction of the Statute.[7]

---

[5]The Latin "*ejusdem generis*" ("of the same kind or class") refers to the canon of construction "that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed." *Black's Law Dictionary* 556 (8th ed. 2004).

[6]I agree with the majority that a "place of entertainment" must have a "particular purpose" of entertaining. *See ante* at 5-6. Accordingly, as I have pointed out (illustratively), an auto mechanic's shop that provides television for waiting customers is probably not a "place of entertainment" because entertaining is not one of the shop's purposes; the shop is in the business of fixing cars. I disagree, however, with the majority's suggestion that an establishment's lone "raison d'être" must be entertaining guests, or that the facility's "amusement and recreational elements" must be "front and center." *See id.* at 7. A business can have more than one purpose and, so long as one of those purposes is entertainment, it is, under the Statute, a "place of entertainment."

[7]The majority contends that its construction of the Statute is also supported by the Americans with Disabilities Act of 1990, which defines "place of public accommodation" more specifically than the Statute. *See ante* at 8; 42 U.S.C. § 12181(7). That Congress has spoken with greater specificity in an unrelated, more recent enactment says nothing, however, of how we must interpret the Public Accommodations Statute.

B.

Viewing the facts in the light most favorable to the Dennys, a specific purpose of the Red Door Spa is to provide entertainment, and it is therefore subject to the Public Accommodations Statute.[8] The majority's conclusion to the contrary is anchored in its factual misapprehension of the Spa as a "salon" that "primarily offer[s] body maintenance services with tangential entertainment value." *Ante* at 7. Although the word "salon" appears in the Spa's title, and although the Spa offers hair-styling services to the public, the record fails to support the proposition that the Spa's singular purpose is the styling of hair.

The name "Elizabeth Arden Red Door Salon and Spa" implies a place where patrons come to relax and divert from their everyday lives. Through the years, the word "spa" has taken on many meanings, from the name of a Belgian town known for the curative properties of its mineral springs; to health baths containing hot, aerated water; to resorts that offer health and beauty treatments; to the modern "day spas" that provide patrons a temporary escape from daily life through massages, mud baths, steam treatments, and the like. *See The New Oxford American Dictionary* 1624 (2d ed. 2005); *The Oxford English Dictionary* Vol. XVI 86-87 (2d ed. 2004); *see also, e.g.*, Gina Damron, *Manhood Makeover: More Men Finding Their Way to Spas*, Detroit Free Press, June 25, 2006, 2006 WLNR 11008673 (citing editor of *Dayspa* magazine for proposition that "some of the reasons why men have become more interested in spa treatments . . . include . . . the need for release from daily stresses"); *Avignon Village "Ordinary Life into Extraordinary" FAST FACTS*, K.C. Star, June 18, 2006, at K1 (describing "7,800-square-foot day spa and clubhouse, designed for convenience and pampering"); Tim Golden, *Jihadist or Victim: Ex-Detainee Makes a Case*, N.Y. Times, June 15, 2006, at A1 (quot-

---

[8]The majority asserts that this dissent is not supported by any court decisions holding that a "salon" is a "place of entertainment." *See ante* at 8. I make two points: (1) the majority fails to point to a single decision ruling that a facility selling massages and calling itself a "spa" is something other than a "place of entertainment"; and (2) the majority's position that the Spa is merely a "salon" finds no basis in this record, and it cannot be established through insistence and repetition only.

ing State Department public diplomacy official: "Guantanamo is not a spa, but nor is it an inhumane torture camp"). It is entirely reasonable to conclude that Elizabeth Arden, in naming the Red Door Spa, used the term "spa" in its normal sense, and that a particular purpose of the Spa is providing services that relax, amuse, and divert its patrons.

More importantly, on this record, the "spa services" provided at the Red Door Spa extend well beyond the mere styling of hair. According to its website, the Spa offers "a complete menu of . . . spa services," including "massage and body treatments" and "*much, much more*." J.A. 65 (emphasis added).[9] Viewed in the proper light, the Spa thus has the specific purpose of relaxing, amusing, and diverting its customers, and the factual premise for the majority's analysis — that the Spa's lone purpose is the styling of hair — has no foothold in the record.

### III.

With all respect for my distinguished colleagues, I dissent from Part II of the majority opinion. I would reverse the district court's summary judgment award on the Public Accommodations Claim and remand for further proceedings.

---

[9]The majority deems factually incorrect the proposition that Elizabeth Arden did things "other than styling hair and providing other beauty services." *Ante* at 6. Yet, it offers no support for its view that the massages offered by the Spa are necessarily "beauty," rather than relaxation, services. *See id.* at 2, 6. Similarly, it fails to explain how the Spa is merely a "salon," when Elizabeth Arden itself named it as the "Red Door Salon *and Spa*," that offers "spa packages" entitled such things as "Miracle Morning," "Red Door Rescue," and "Executive Escape," and which include massages.