UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-2070

DAG PETROLEUM SUPPLIERS, L.L.C.,

Plaintiff - Appellant,

versus

BP P.L.C.; BP PRODUCTS NORTH AMERICA,
INCORPORATED,

Defendant - Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. James C. Cacheris, Senior
District Judge. (1:05-cv-01323)

Argued: December 5, 2007            Decided: January 23, 2008

Before TRAXLER, DUNCAN, Circuit Judges; and James P. JONES, Chief
United States District Judge for the Western District of Virginia,
sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Roy Theodore Englert, Jr., ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER, L.L.P., Washington, D.C., for
Appellant. Richard Cartier Godfrey, KIRKLAND & ELLIS, L.L.P.,
Chicago, Illinois, for Appellee. **ON BRIEF:** Michael Joseph, Patrick
O. Cavanaugh, William R. Martin, Alex Blanton, BLANK ROME, L.L.P.,
Washington, D.C.; Geoffrey P. Gitner, Washington, D.C.; Noah A.
Messing, ROBBINS, RUSSELL, ENGLERT, ORSECK, UNTEREINER & SAUBER,
L.L.P., Washington, D.C., for Appellant. Craig C. Reilly,
RICHARDS, MCGETTIGAN, REILLY & WEST, P.C., Alexandria, Virginia;

Andrew B. Bloomer, Donna M. Welch, Matthew T. Regan, KIRKLAND & ELLIS, L.L.P., Chicago, Illinois, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

DAG Petroleum Suppliers, L.L.C. ("DAG") and its Chairman and majority owner, Eyob "Joe" Mamo ("Mamo"), an African American, allege that BP Products North America Inc. ("BPPNA") and its parent company, BP P.L.C., (collectively "BP") discriminated against DAG on account of Mamo's race when BPPNA, after conducting a lengthy auction, selected two non-minority owned businesses to purchase 182 of its "BP" gasoline service stations in the Washington and Baltimore metropolitan areas. DAG further claims that its elimination from the auction was the culmination of an elaborate business conspiracy between BP and Eastern Petroleum Corporation ("Eastern"), one of the winning bidders, aimed at injuring DAG by denying it the "once-in-a-lifetime opportunity" to acquire a large number of valuable stations in its home territory. The district court granted summary judgment in favor of BP on both DAG's discrimination claims under 42 U.S.C. §§ 1981 and 1982 and its business conspiracy claim under Virginia Code §§ 18.2-499 - 18.2-500. For the reasons that follow, we affirm.


I

As we are reviewing a grant of summary judgment, we recite the facts in the light most favorable to DAG. See Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004). In March 2005, BPPNA released a Confidential Information Memorandum ("CIM") to a select

3

group of petroleum jobbers,[1] inviting them to participate in an auction to purchase a number of its service stations. DAG was among the invitees.

The CIM grouped the service stations into seven packages labeled A through G, and encouraged each invited company to submit a first-round bid on one, all, or any combination of the packages that the company desired to purchase. The CIM also required each bid to include or comment upon several different items. Among these mandatory items were (1) the cash price offered, (2) the number of gallons of petroleum that the bidder was willing to commit to purchasing from BPPNA going forward, if any (the "volume commitment"), and (3) any material concerns that the bidder had with the commercial terms set forth in the prospective Sale and Purchase Contract Term Sheet. The CIM further informed the invitees that the existing dealer-operator of each auctioned service station "w[ould] be given a first right of refusal to purchase BP[PNA]'s interest in that site on the same basis as BP[PNA] would be willing to accept for that site within the [auction] process." J.A. 821. BPPNA also "expressly reserve[d] the right, at any time and in any respect, and without giving reasons therefor, to amend or terminate these procedures, to terminate discussions with any or all interested parties, to reject

---

[1]Petroleum jobbers, or marketers, essentially act as middlemen between companies who refine petroleum products and those that process or market such products at retail.

any or all proposals, or to negotiate with any party with respect to a transaction." J.A. 822.

After evaluating the first-round bids and "other commercial factors," BPPNA selected thirteen companies for the final bidding round to be conducted in June 2005. J.A. 822. The finalist-companies most relevant to this appeal are DAG--the only minority-owned auction participant[2]--and Eastern.

DAG submitted its "final" bid on June 20, 2005. This bid offered $86.9 million for packages A through D, $93.8 million for A through E, and $117 million for A through G. J.A. 1088. It also included a non-solicited bid, offering more cash if BPPNA would forego the dealer-operator right of first refusal. J.A. 1090.

Eastern submitted its final bid on June 21, 2005. The bid included a separate cash offer for each package A through G, and an offer for the entire group of packages--adding a 10% premium to the sum of the individual offers if Eastern were awarded the entire group. Totaling the pertinent bids, Eastern offered $99.8 million for packages A through D, $112.6 million for packages A through E, and $167.9 million for packages A through G--including the 10% premium. J.A. 864-65. As to the volume commitment, Eastern indicated that it "ha[d] committed to 10 additional BP stations [over the following two years] that [we]re projected to deliver

_____

[2]At the time of the auction DAG was the only African-American owned petroleum jobber in the United States.

more than 30 million gallons annually and plan[ned] to develop at least 5 new BP stations annually thereafter." J.A. 865. Eastern emphasized its "significant historical investments in BP branded development projects" and the success it had in the past as a BPPNA "jobber." J.A. 865. Of noted importance to BPPNA, Eastern's bid also included a plan for facilitating the dealer-operators' rights of first refusal in which Eastern would assist any dealer-operator who chose to exercise such right in obtaining financing.

According to BPPNA, and undisputed by DAG, on approximately June 27, 2005, BPPNA informed Eastern of its advancement to the "final negotiating round" (subsequent to the "final bidding round"). BPPNA also indicated that it was considering selling the Washington group (packages A through D) and the Baltimore group (packages E through G) to separate bidders. The following day, Eastern informed BPPNA that it intended to negotiate only for the Washington group. The contents of Eastern's offer at that time are disputed. Although BPPNA contends that Eastern then agreed to maintain the 10% price premium, setting its cash offer to $110.8 million for A through D and $125.1 million for A through E, and made an oral commitment to purchasing 90 million gallons of petroleum volume over the next five years, we are obliged to accept DAG's claim that the 10% premium for packages A through D and A through E and the 90 million gallon volume commitment were not agreed to by Eastern on this date or any date prior to DAG's final

6

elimination from the auction.[3]

The following week, BPPNA informed DAG that it had been eliminated from further participation in the auction on the ground that its June 20th bid offered far less economic and strategic value than Eastern's bid. BPPNA nevertheless allowed DAG to submit an additional "final" bid for consideration on July 6, 2005. In the July 6th bid, DAG increased its cash offer to $110 million for packages A through D, $118.5 million for A through E, and $150 million for A through G, and no longer opposed the dealer-operator right of first refusal. DAG also committed to the purchase of a volume of 17.2 million gallons of petroleum. DAG supplemented its bid with an unsolicited offer to contribute additional capital to equipment improvements at the stations and to assist BPPNA with environmental clean-up going forward.

On July 13, 2005, BPPNA informed DAG and Mamo that it still considered DAG's bid inferior to at least one other company's offer and that, therefore, DAG had again been eliminated from the auction. Mamo then requested a third opportunity to submit a

---

[3]In support of this claim, DAG points to the lack of any documentation "memorializing" these figures and also cites an internal BPPNA document created on July 15th which lists Eastern's cash bid as only $112.6 million for packages A through E, the price without the "premium." J.A. 859. This same document, however, lists another bidder, "Alliance," not DAG or Eastern, as the "Top Bidder," and memorializes Eastern's 90 million gallon volume commitment. Id. DAG also points to a July 12th document from Eastern's bankers to Eastern referencing the $112.6 million bid amount. J.A. 914. We analyze DAG's claim accepting its version of the facts as true.

7

"final" bid, and on July 15th informed BPPNA by phone that DAG was willing to raise its offer to $117 million for packages A through D, and to $127.1 million for packages A through E. This bid, if accepted, would have slightly exceeded the cash amount of Eastern's final bid, including the 10% premium. BPPNA, however, declined to consider DAG's bid, purportedly because the bidding rounds had already ended, the bid was not in writing, it did not comment on each of the required items, and it was not submitted to the BPPNA project manager as specified in the CIM.

BPPNA then began negotiations with Eastern for packages A through D and a portion of E, and instructed two other companies, Carroll Independent Fuel Company ("Carroll") and Lehigh Gas Corporation ("Lehigh"), to provide their best, final offers for packages E through G. BPPNA eventually entered into Purchase and Sale Agreements with Eastern and Carroll, selling the Washington group and a portion of package E to Eastern and the remainder of the Baltimore group to Carroll, for a cash amount totaling $156.8 million. Eastern's 10% price premium is reflected in this purchase price. BPPNA and Eastern also entered into separate supply contracts in which Eastern committed to purchase 101 million gallons of petroleum from BPPNA.

Mamo and DAG subsequently brought suit against BP in the United States District Court for the Eastern District of Virginia, alleging that DAG's elimination from the auction was the result of

8

race discrimination, in violation of 42 U.S.C. §§ 1981 and 1982. After discovery, DAG amended its complaint to include a business conspiracy claim under Virginia Code §§ 18.2-499 - 18.2-500.

The district court granted summary judgment in favor of BP on all counts.[4]  The court first rejected DAG's discrimination claims finding that DAG failed to show, as both § 1981 and § 1982 require, that BPPNA's proferred reasons for rejecting its bid were a pretext for race discrimination.  Specifically, the court found that (1) "BPPNA offered the contract to a more lucrative, more advantageous offer than DAG's Final Bid"; (2) "DAG provide[d] no evidence of BPPNA's alleged bad-faith manipulation of Eastern's bid"; and (3) "DAG provide[d] no evidence of racial animus or any evidence at all that BPPNA's decision was motivated by the race of DAG's CEO." J.A. 472.  Next, the district court granted summary judgment on DAG's business conspiracy claim, finding that DAG "provided no evidence of an agreement or an intent to injure, both of which are required to establish a business conspiracy" under Virginia law. J.A. 478.  DAG filed a timely appeal.

---

[4]The court first granted summary judgment on DAG's claims against BPPNA.  Then, since "DAG's claims of discrimination and conspiracy against BP p.l.c. [we]re derived solely from BPPNA's relationship to BP p.l.c. as its parent corporation," the district court found that summary judgment was also proper for the same claims of discrimination and conspiracy against BP p.l.c.  J.A. 479.  We, too, find DAG's claims against BP p.l.c. to be contingent on BPPNA's liability.  Therefore, we will analyze these claims simultaneously and refer to BPPNA and BP p.l.c. collectively throughout our analysis as "BP."

9

DAG first asserts that summary judgment was inappropriate on its race discrimination claims because genuine issues of material fact exist as to whether BP, in eliminating DAG from the auction and instead selling the service stations to non-minority owned companies, interfered with DAG's right to contract and right to purchase property in violation of 42 U.S.C. §§ 1981 and 1982.

We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in favor of DAG, the non-moving party. See Williams, 372 F.3d at 667. Summary judgment is appropriate when the evidence demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). A genuine issue does not exist unless there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). If, therefore, the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be [properly] granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

Section 1981, in relevant part, grants all persons within the jurisdiction of the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981 (a). Section 1982 likewise prohibits race

10

discrimination in the purchase and sale of goods by providing that "[a]ll citizens . . . shall have the same right, . . . as is enjoyed by white citizens to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. To succeed on a claim under either section, a plaintiff must demonstrate that the defendant intended to discriminate on the basis of race. See Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 434 (4th Cir. 2006). Where, as here, the plaintiff is unable to present direct evidence of discriminatory intent, its claims are subject to the burden-shifting McDonnell Douglas analytical framework. See Williams, 372 F.3d at 667; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-5 (1973).

Under this framework, to avert summary judgment, a plaintiff must first establish a prima facie case of discrimination. Id. If the plaintiff can so establish, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Hawkins v. PepsiCo, Inc., 203 F.3d 274, 278 (4th Cir. 2000). Once the defendant has done so, the plaintiff must then offer sufficient evidence upon which a reasonable jury could find, by a preponderance of the evidence, that the defendant's proffered reason was not its true reason, but was instead a pretext for race discrimination. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000). If the plaintiff can satisfy this burden by proving the defendant's stated reason unworthy of credence, summary

11

judgment is inappropriate as the trier of fact may then properly infer the ultimate fact of intentional discrimination.  Id. at 147.


A

We now apply the McDonnell Douglas framework to DAG's claims to assess the propriety of the district court's grant of summary judgment.  First, we determine whether DAG has established a prima facie case of discrimination.

The Fourth Circuit has not yet had an opportunity to determine the proper elements of a prima facie case in the public bidding context.  Heeding the Supreme Court's admonition in Texas Dep't of Cmty. Affairs v. Burdine that demonstrating a prima facie case should "not [be] onerous,"  450 U.S. 248, 253 (1981), the district court applied the four-part test developed by the Eleventh Circuit in Brown v. American Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991).   The American Honda test requires the plaintiff to demonstrate that: (1) it is a member of a protected class; (2) it submitted a bid which met the requirements for the available contract; (3) the bid was ultimately rejected; and (4) the contract was awarded to an individual or entity who is not a member of a protected class.  Id.  This test closely comports with the prima facie test regularly applied by this court in other causes of action alleging discrimination in the purchase of goods or services.  See e.g., Williams, 372 F.3d at 667 (requiring the

12

plaintiff to establish, when alleging discrimination by a chain of retail stores, that: "(1) he is a member of a protected class; (2) he sought to enter into a contractual relationship with the defendant; (3) he met the defendant's ordinary requirements to pay for and to receive goods or services ordinarily provided by the defendant to other similarly situated customers; and (4) he was denied the opportunity to contract for goods or services that was otherwise afforded to white customers."). Despite this congruity and the Supreme Court's guidance, BP urges us to adopt the more burdensome test set out by the First Circuit in T&S Services Associates, Inc. v. Crenson, 666 F.2d 722, 725 (1st Cir. 1981), which differs from the American Honda test by requiring the plaintiff to demonstrate, under the third prong, that its bid was "significantly more advantageous" than the bid that was ultimately selected. Id.

Because, as we will discuss infra, DAG's discrimination claims clearly fail under the final step of the McDonnell Douglas framework, we leave it to another day to determine the proper contours of a prima facie case in the bidding context. Instead, we assume, as the district court found, that DAG has established such a case, and proceed to the next phase of the analysis.

13

B

Assuming that DAG has made out a prima facie case and therefore established a "legally mandatory, rebuttable presumption" of unlawful discrimination, the burden shifts to BP to assert a nondiscriminatory explanation for DAG's elimination from the auction. See Lettieri v. Equant Inc., 478 F.3d 640, 648 (4th Cir. 2007) (internal quotations omitted). BP has met this burden by proffering evidence that it eliminated DAG in favor of other companies whose bids offered BP more economic and strategic value. Specifically, BP asserts that (1) the cash amount offered by the other companies was substantially higher than that offered by DAG; (2) the volume of petroleum which DAG would commit to purchasing was significantly less than the volume commitment of those selected for final negotiation; (3) Eastern, the company to which BP afforded the Washington group, was already in a similar relationship with BP as an existing "jobber"; and (4) DAG opposed the right of first refusal that BP required be included in the contract, while the winning bidders, Eastern and Carroll, offered plans to facilitate this right.

14

DAG acknowledges, as it must, that with these reasons BP has successfully caused the burden to shift back to DAG, such that DAG must now show that BP's proffered explanation is a pretext for race discrimination. As DAG also recognizes, in this context, "[p]retext is a lie" or cover-up, not merely a mistake. Price v. Thompson, 380 F.3d 209, 214 n.1 (4th Cir. 2001) (internal quotations omitted). Therefore, evidence that BP "erroneously or even purposely misapplied [its own] policy," will not suffice to overcome summary judgment. See Dugan v. Albemarle County School Bd., 293 F.3d 716, 722 (4th Cir. 2002). Neither will unsupported "assertions of discrimination in and of themselves [be sufficient] to counter unrebutted evidence of legitimate, nondiscriminatory reasons" for BP's decision to choose other bidders. Id. Rather, DAG must show that BP fabricated its stated reason to establish pretext.

DAG fails to carry its burden. Instead, in an effort to survive summary judgment, DAG attempts to create several factual disputes concerning the terms of the winning bids, and also to urge that "[a] jury could conclude that DAG's bid was superior to the winning bid." Appellant's Br. at 21. In particular, DAG contends that a jury could deduce that its July 6th bid was the most lucrative offer on the table when it was eliminated from the auction on July 13th, if the jury found that (1) Eastern did not

15

offer the 10% premium which DAG admits that Eastern ultimately paid; (2) Eastern did not offer the volume commitment which was also included in the eventual agreement; and (3) BP improperly afforded DAG little or no credit for its unilateral offer to replace old equipment and assist BP with environmental clean-up. DAG also asserts that a jury could conclude that BP improperly ignored DAG's July 15th bid. This bid, too, DAG contends, could be found higher than that which Eastern and Carroll ultimately paid if the trier of fact, again, excludes Eastern's 10% premium, does not consider or value Eastern's volume commitment, and subtracts $10.5 million from Eastern's bid for an insurance subsidy that DAG claims BP paid Eastern in a "side deal."

DAG's labyrinthine argument misconceives both the standard for summary judgment and the burden it carries under step three of the McDonnell Douglas framework. DAG's argument is comprised solely of inferential leaps and speculative conclusions as to what a jury might find. "Mere speculation," however, cannot create a genuine factual dispute, nor can "the building of one inference upon another." Cox, 249 F.3d at 300.

DAG's argument is further unavailing because an alleged factual dispute cannot "defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation." JKC Holding Co. LLC v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Even if

16

a jury were to view DAG's bid as superior, this would suggest nothing more than the possibility that BP made an unsound business decision. A showing of pretext, as DAG recognizes, requires more. As we have previously concluded, it is not within our province to decide whether the decisions of companies like BP are "wise, fair, or even correct," so long as they are predicated on non-discriminatory reasons. Dugan, 293 F.3d at 722 (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)). DAG must provide sufficient evidence for a jury to find not that DAG's bid could be considered superior, but that BP did conclude as much and rejected DAG's bid nonetheless. See id. The collage of evidentiary pieces that DAG has assembled in support of its claim, even when viewed in the light most favorable to it, fail to make this showing. As no reasonable jury could conclude on the record before us that BP's legitimate reasons for eliminating DAG from the auction were a pretext for race discrimination, summary judgment against DAG on its claims under § 1981 and § 1982 was proper.

III

DAG also contends that summary judgment should have been denied on its claim against BP under the Virginia Business Conspiracy Act. See Va. Code Ann. §§ 18.2-499 - 18.2-500. In pertinent part, section 18.2-499 permits recovery where "[a]ny two or more persons . . . combine, associate, agree, mutually undertake

17

or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever." Section 18.2-500 provides civil damages for such action. In order to sustain a claim under these sections, DAG must prove by clear and convincing evidence that: (1) BP agreed or conspired with another party or parties; (2) the conspirators acted with legal malice, that is, acted intentionally, purposefully, and without lawful justification; and (3) the intentional actions of the conspirators proximately caused injury to DAG. See Simmons v. Miller, 544 S.E.2d 666, 676-77 (Va. 2001).

DAG alleges, in essence, that rather than simply exercising its right to sell the service stations to Eastern or any other company in the first instance, BP set out to injure DAG by inviting it to participate in a fraudulent auction, feigning the acceptance and consideration of several of its bids, and advancing it to the final bidding rounds before unfairly eliminating it from the concocted auction. In the course of so doing, according to DAG, BP conspired with Eastern to leak insider information to Eastern and manipulate its bid in several respects, all in an effort to ensure that Eastern's bid looked superior to DAG's so that DAG's elimination could appear justified. This claim, too, is completely devoid of coherent evidentiary support. DAG fails to present any evidence either of a conspiracy between BP and Eastern or legal malice on behalf of either company. Therefore, any injury that DAG

18

may have suffered is not actionable under the Virginia Business Conspiracy Act.

## IV

For the foregoing reasons, the judgment of the district court is

AFFIRMED.